Bongiovi v Pulla (2024 NY Slip Op 50653(U))

[*1]

Bongiovi v Pulla

2024 NY Slip Op 50653(U)

Decided on May 31, 2024

Supreme Court, Richmond County

Castorina, Jr., J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 31, 2024
Supreme Court, Richmond County

John Eric Bongiovi, Plaintiff,

against
Hernan Pulla, Uber Technologies, Inc., Uber USA, LLC, and Raiser-NY, LLC, Defendant.

Index No. 150935/2023

Attorney for the Plaintiff
MICHAEL DAVID FITZGERALD 
SGARLATO & SGARLATO, PLLC 
1444 Clove Rd
Staten Island, NY 10301 
Phone: (718) 273-7900 
E-mail: mfitzgerald@sgarlatolaw.com
Attorney for Defendant Pulla
RONIT Z MOSKOVITS 
BAKER, MCEVOY & MOSKOVITS, P.C. 
5 Broadway Ste 3
Freeport, NY 11520 
Phone: (212) 857-8223 
E-mail: eservice@bm3law.com
Attorney for Defendants Uber Technologies, Inc., Uber USA, LLC, and Raiser-NY, LLC
MICHELLE RIVLIN KOLODNY 
Haworth Barber and Gerstman LLC 
777 Third Avenue Suite 2104
New York, NY 10017 
Phone: (212) 952-1100 
E-mail: michelle.kolodny@hbandglaw.com 

Ronald Castorina, Jr., J.

The following e-filed documents listed on NYSCEF (Motion #001) numbered 18-24, 52-53, 67-70, 84; (Motion #002) numbered 27-51, 71-76, 82-83; and (Motion #003) numbered 54-65, 77-80 were read on this motion.
Upon the foregoing documents, and after oral argument conducted on May 9, 2024, on Motion Sequence #001, Motion Sequence #002 and Motion Sequence #003, Motion Sequence #001, Motion Sequence #002, and Motion Sequence #003 are resolved and therefore, it is hereby,
ORDERED, that the prong of Plaintiff's Motion Sequence No. 001 seeking summary judgment on the issue of Defendant Pulla's negligence in favor of the Plaintiff and against Defendant Pulla pursuant to CPLR § 3212 on the grounds that no material issues of fact exist regarding any negligence and/or liability on his part is DENIED, with prejudice; and it is further,
ORDERED, that the prong of Plaintiff's Motion Sequence No. 001 seeking to strike Defendant Pulla's Second Affirmative Defense alleging comparative fault on the part of the Plaintiff is DENIED with prejudice; and it is further,
ORDERED, that the prong of Plaintiff's Motion Sequence No. 001 seeking to strike Defendant Pulla's Fourth Affirmative Defense alleging Plaintiff's failure to wear a seat belt is GRANTED with prejudice; and it is further,
ORDERED, that the prong of Plaintiff's Motion Sequence No. 001 seeking to strike Defendant Uber's Twentieth Affirmative Defense alleging Plaintiff's failure to wear a seat belt is GRANTED with prejudice; and it is further,
ORDERED, that Defendant Uber's Motion Sequence No. 002 seeking summary judgment and dismissal of Plaintiff's complaint and any crossclaims is GRANTED with prejudice; and it is further,
ORDERED, that the Defendant Pulla's Motion Sequence #003 seeking summary judgment on the issue of damages and any possible claim of economic loss, on the grounds that plaintiff did not sustain a "serious injury" because of the accident as defined by Insurance Law § 5102 [d], and as required by Insurance Law § 5104 [a] is DENIED, with prejudice; and it is further,
ORDERED, that the Clerk of the Court shall enter judgment accordingly.
 Memorandum Decision

 I. Procedural History
On May 17, 2023, Plaintiff commenced this negligence action to recover for personal injuries allegedly sustained by the Plaintiff because of a two-vehicle motor vehicle accident on January 13, 2023. Plaintiff filed Motion Sequence #001 by Notice of Motion on February 29, 2024, seeking (a) summary judgment on the issue of Defendant Pulla's negligence in favor of the Plaintiff and against Defendant Pulla pursuant to CPLR § 3212; and (b) to strike Defendant Pulla's Second Affirmative Defense alleging comparative fault on the part of the Plaintiff. Plaintiff further seeks (c) to strike Defendant Pulla's Fourth Affirmative Defense alleging Plaintiff's failure to wear a seat belt; (d) to strike Defendants Uber Technologies, Inc., Uber USA, LLC, and Raiser-NY, LLC's, herein after collectively referred to as Defendants Uber, Twentieth Affirmative Defense alleging Plaintiff's failure to wear a seat belt; and (e) such other and further relief as to this Court may seem just and proper.
On April 17, 2024, Defendants Uber filed opposition to Motion Sequence No. 001. On May 2, 2024, Defendant Pulla filed opposition to Motion Sequence No. 001. Plaintiff filed reply [*2]on Motion Sequence No. 001 on May 8, 2024.
On April 14, 2024, Defendants Uber filed Motion Sequence No. 002 by Notice of Motion seeking (1) summary judgment (2) dismissal of Plaintiff's complaint and any crossclaims; and (3) such other relief as this Court deems just and proper. On May 2, 2024, Plaintiff filed opposition on Motion Sequence No. 002. Defendants Uber filed reply on Motion Sequence No. 002 on May 7, 2024.
On April 29, 2024, Defendant Pulla filed Motion Sequence No. 003 by Notice of Motion seeking (i) summary judgment and dismissing the complaint of Plaintiff pursuant to CPLR § 3212, on the grounds that Plaintiff did not sustain a "serious injury" because of the accident as defined by Insurance Law § 5102 [d] and (ii) such other further relief as the Court deems just and proper. Plaintiff filed opposition to Motion Sequence No. 003 on May 3, 2024. On May 9, 2024, Defendant Pulla waived reply on the record.
On May 9, 2024, oral argument was completed on Motion Sequence No. 001, Motion Sequence No. 002, and Motion Sequence No. 003.

 II. Facts
On January 13, 2023, at approximately 4:00 PM, Plaintiff was involved in an accident at the intersection of Queen Street and Graves Street in Staten Island, New York. (NY St Cts Filing [NYSCEF] Doc No. 22 at pages 15-18). Plaintiff was traveling on Queen Street when the accident occurred (see id at page 17) and there were no traffic control devices on Queen Street in the direction he was traveling, but there is a stop sign for traffic traveling on the cross street, Graves Street. (see id at page 20).
Plaintiff testified at his EBT on November 30, 2023, that his highest rate of speed leading up to the intersection was approximately 20 miles per hour and that the speed limit is 25 miles per hour in that vicinity. (see id at page 21). Plaintiff further testified that he was wearing his seat belt at the time the accident occurred (see id at page 16).
Defendant Pulla testified at his EBT on December 1, 2023, that at the time of the accident, he was driving for Uber, and he had a passenger in his vehicle that he had acquired through the Uber application. (NY St Cts Filing [NYSCEF] Doc No. 23 at pages 24). Defendant Pulla does not dispute that he had a stop sign at the intersection where the accident occurred and testifies that he made a full stop at the stop sign. (see id at 37).
Defendant Pulla testified regarding his stop at the stop sign.
Q. When you stopped at that location in what direction were you looking when you stopped at that location?
A. I looked to the right and to the left.
Q. One time or more than one time?
A. Once. (see id at 38-39).
Defendant Pulla was further questioned regarding his visual range at the stop sign.
Q. When you looked to the right do you recall how far on that intersecting street you were able to see?
A. Maybe more than a block.
Q. When you stopped at that location do you recall how far to your left when you looked you were able to see?
A. The same. You can see the same. No. Yes.
Q. Was it the same?
A. Yes, it was the same.
Q. At that location when you looked in either direction was there anything obstructing your vision of seeing traffic coming in either direction?
A. No, just that the other side there is a curve that is coming like in a curved way. (see id at 39-40).
Defendant Pulla stopped his vehicle at the intersection in between the stop sign and stop line (see id at page 37, lines 8-17) for approximately ten to fifteen seconds (see id at page 41, lines 14-24). Defendant Pulla looked to his right and left when he stopped and there was nothing obstructing his vision of seeing traffic coming in either direction. Defendant Pulla testified he was able to see a block both towards his right and left and there was no vehicle was visible (see id at page 41, lines 4-13). Defendant Pulla contends that the first time he saw Plaintiff's vehicle was after the accident had occurred (NY St Cts Filing [NYSCEF] Doc No. 24 at page 9, lines 14-22).
Defendant Pulla was questioned regarding his use of a GPS system at the time of the accident.
Q. Was your vehicle equipped with GPS or navigation?
A. Yes, I work with a GPS, because Uber provides me with a GPS. I work for Uber.
Q. Is that through your telephone or is it in the vehicle itself?
A. On my phone.
Q. Immediately prior to the happening of the accident were you following the navigation through the Uber application of your phone?
A. Supposedly, I have to follow the GPS of the car.
Q. I'm asking you were you doing that at the time the accident occurred?
A. With one eye I look at the GPS. With the other eye I drive straight.
Q. Go ahead. Go ahead.
A. I look really fast. It's not like I stay there watching the GPS. It's fast. (see id at 13-14).
Plaintiff reported to police that Defendant Pulla "rolled through stop sign and entered the intersection" at the time of the accident. (NY St Cts Filing [NYSCEF] Doc No. 21). Defendant Pulla reported to police that Plaintiff was speeding through the intersection, did not have a stop sign, and collided into the side of his vehicle. (see id).
At the time of the impact, Plaintiff had his foot on the accelerator and did not engage the brake because he was "driving and had the right-of-way." (NY St Cts Filing [NYSCEF] Doc No. 22 at page 99, lines 21-24).
Plaintiff appeared for an orthopedic Independent Medical Examination with Dr. Pierce J. Ferriter on January 23, 2024. Plaintiff reported to Dr. Ferriter that he was involved in a motor vehicle accident on January 13, 2023 and he was rendered unconscious as for few seconds a result of the accident. (NY St Cts Filing [NYSCEF] Doc No. 63). Dr. Ferriter found that Plaintiff's ranges of motion of his cervical spine, thoracic spine, lumbar spine, left shoulder, left elbow, and right knee were all normal. (see id). Dr. Ferriter's examination further revealed no evidence of orthopedic disability or permanency. (NY St Cts Filing [NYSCEF] Doc No. 64).
Plaintiff was employed as a chief engineer at a building at the time of the accident and returned to work twelve (12) days to three (3) weeks after the accident and testified in his EBT regarding his return to work.
Q. And that was two or three weeks after the accident that you went back to work, is that what you said?
A. Yeah, I had to force myself to get back to work because I have bills to pay, yes.
Q. Were you paid for that time by your employer?
A. Yes, yes.
Q. Did you miss any time from work after returning after the shoulder surgery up until the neck surgery, did you miss any time in that—
A. Yeah, I mean there's days that I took off a couple of days because I was in pain in my neck or pain in my back, where I just couldn't go in, you know. So there's days here and there but not like weeks at a time, you know, because of my title.
Q. About how many days did you miss?
A. I would say maybe 15, 20, 25. I don't know the exact number. (NY St Cts Filing [NYSCEF] Doc No. 22 at page 54-55).
Plaintiff contends that as a direct result of the accident, he was confined to Staten Island University Hospital, on January 15, 2023. (NY St Cts Filing [NYSCEF] Doc No. 61). Plaintiff further contends that on April 26th, 2023, Plaintiff under anesthesia had left shoulder arthroscopy with debridement, synovectomy, chondroplasty, bursectomy, acromioplasty, excision, and repair and was confined to SUNY Downstate Medical Center in Brooklyn, New York. (see id).

III. Plaintiff Motion for Summary Judgment on Negligence
"Summary judgment is designed to expedite all civil cases by eliminating from the Trial Calendar claims which can properly be resolved as a matter of law. Since it deprives the litigant of his day in court it is considered a drastic remedy which should only be employed when there is no doubt as to the absence of triable issues" (see Andre v. Pomeroy, 35 NY2d 361 [1974] citing Millerton Agway Cooperative, Inc. v. Briarcliff Farms, Inc., 17 NY2d 57 [1966]).
"A motion for summary judgment shall be supported by affidavit, by a copy of the pleadings and by other available proof, such as depositions and written admissions" (see Poon v Nisanov, 162 AD3d 804 [2d Dept 2018] quoting CPLR § 3212 [b]). "The moving party's submissions must show 'that there is no defense to the cause of action or that the cause of action or defense has no merit'" (see id). "To defeat summary judgment, the nonmoving party need only rebut the prima facie showing made by the moving party so as to demonstrate the existence of a triable issue of fact" (see id citing Alvarez v. Prospect Hosp., 68 NY2d 320 [1986]; Stukas v. Streiter, 83 AD3d 18 [2d Dept 2011]).
"On a motion for summary judgment, facts must be viewed 'in the light most favorable to the non-moving party'" (see Shabat v State of New York, 177 AD3d 1009 [2d Dept, 2019] quoting Vega v Restani Constr. Corp., 18 NY3d 499 [2012]; Ortiz v. Varsity Holdings, LLC, 18 NY3d 335 [2011]).
"Negligence cases by their very nature do not usually lend themselves to summary judgment, since often, even if all parties are in agreement as to the underlying facts, the very question of negligence is itself a question for jury determination" (see Davis v Commack Hotel, LLC, 174 AD3d 501 [2d Dept 2019] quoting Ugarriza v Schmieder, 46 NY2d 471 [1979]; citing Andre v Pomeroy, 35 NY2d 361 [1974]; Evans v Jones, 286 AD 921 [4th Dept 1955]).
Defendant Pulla maintains he stopped his vehicle at the intersection in between the stop sign and stop line (NY St Cts Filing [NYSCEF] Doc No. 23 at page 37, lines 8-17) for approximately ten to fifteen seconds (see id at page 41, lines 14-24). Defendant Pulla looked to his right and left when he stopped and there was nothing obstructing his vision of seeing traffic coming in either direction. Defendant Pulla testified he was able to see a block both towards his right and left and there was no vehicle was visible (see id at page 41, lines 4-13). Defendant [*3]Pulla contends that the first time he saw Plaintiff's vehicle was after the accident had occurred (NY St Cts Filing [NYSCEF] Doc No. 24 at page 9, lines 14-22). Defendant Pulla noted that on the other side of the road there is a curve. (NY St Cts Filing [NYSCEF] Doc No. 23 at 39-40).
Plaintiff contends that his highest rate of speed leading up to the intersection was approximately 20 miles per hour. ((NY St Cts Filing [NYSCEF] Doc No. 22 at page 21). At the time of the impact, Plaintiff had his foot on the accelerator and did not engage the brake because he was "driving and had the right-of-way." (see id at page 99, lines 21-24).
"On a motion for summary judgment, the moving party has the initial burden of coming forward with sufficient proof in admissible form to enable the court to determine that it is entitled to judgment as a matter of law" (see Rosa v. Gordils, 211 AD3d 1060 [2d Dept 2022] quoting Gesuale v Campanelli & Assoc., P.C., 126 AD3d 936 [2d Dept 2015]). "Defendants moving for summary judgment in a negligence action arising out of an automobile accident have the burden of establishing, prima facie, that they were not at fault in the happening of the accident" (see id quoting Elusma v Jackson, 186 AD3d 1326 [2d Dept 2020]; Nesbitt v Gallant, 149 AD3d 763 [2d Dept 2017]).
"There [may] be more than one proximate cause of an accident, and, [g]enerally, it is for the trier of fact to determine the issue of proximate cause" (see id quoting Choo v. Virginia Transp. Corp., 204 AD3d 743 [2d Dept 2022]; citing Shuofang Yang v. Sanacore, 202 AD3d 1120 [2d Dept 2022]). "[T]he issue of proximate cause may be decided as a matter of law where only one conclusion may be drawn from the established facts" (see id quoting Rodriguez v. Palacio, 199 AD3d 728 2d Dept 2021]).
Although Defendant Pulla's direction of travel was controlled by a stop sign, there are triable issues of fact, inter alia, as to whether the Plaintiff was free of negligence. (see Campbell-Lopez v Cruz, 31 AD3d 475 [2d Dept 2006] citing Romano v. 202 Corp., 305 AD2d 576 [2d Dept 2003]; Hernandez v Bestway Beer & Soda Distrib., 753 NYS.2d 467 [1st Dept 2003]).
Plaintiff has failed to demonstrate his prima facie entitlement to judgment as a matter of law. Plaintiff has failed to establish that he was free from fault in the cause of the accident. The evidence submitted is insufficient to establish prima facie Plaintiff's entitlement to judgment as a matter of law as it failed to eliminate triable issues of fact regarding whether Plaintiff was free from fault in the occurrence of the accident.
Accordingly, the prong of Plaintiff's Motion Sequence No. 001 seeking summary judgment on the issue of Defendant Pulla's negligence in favor of the Plaintiff and against Defendant Pulla pursuant to CPLR § 3212 on the grounds that no material issues of fact exist regarding any negligence and/or liability on his part is DENIED, with prejudice.

 IV. Strike Affirmative Defenses
Plaintiff seeks to strike (1) Defendant Pulla's Second Affirmative Defense alleging comparative fault on the part of the Plaintiff, (2) Defendant Pulla's Fourth Affirmative Defense alleging Plaintiff's failure to wear a seat belt; and (3) Defendant Uber's Twentieth Affirmative Defense alleging Plaintiff's failure to wear a seat belt.
"The rule now is that an answer containing defenses or denials may be stricken out as sham or frivolous when the motion papers on a motion for summary judgment make it appear that the answer falls within either category." (see Cleghorn v Ocean Accident & Guar. Corp., 216 AD 342 [2d Dept 1926] citing Commonwealth Fuel Co. v Powpit Co., 212 AD 553 [2d Dept 1925]).
"The issue of a plaintiff's comparative negligence, however, may be decided in the [*4]context of a summary judgment motion where the plaintiff moves for summary judgment dismissing a defendant's affirmative defense alleging comparative negligence" (see Abramov v Martinez, 224 AD3d 794 [2d Dept 2024] citing Seizeme v Levy, 208 AD3d 809 [2d Dept 2022]; Sapienza v Harrison, 191 AD3d 1028 [2d Dept 2021]).
Plaintiff maintains that at the time of the accident his highest rate of speed leading up to the intersection was approximately 20 miles per hour (NY St Cts Filing [NYSCEF] Doc No. 22) and further maintained in the police report that Defendant Pulla "rolled through stop sign and entered the intersection" at the time of the accident. (NY St Cts Filing [NYSCEF] Doc No. 21). Defendant Pulla reported to police that Plaintiff was speeding through the intersection, did not have a stop sign, and collided into the side of his vehicle. (see id).
Defendant Pulla contends he stopped his vehicle at the intersection for approximately ten to fifteen seconds, looked to his right and left, with nothing obstructing his vision and he was able to see a block both in each direction and there was no vehicle was visible (NY St Cts Filing [NYSCEF] Doc No. 23).
"The conflicting statements by the Plaintiff and Defendant Pulla in their EBTs and in the police report fail to resolve all issues of fact regarding which vehicle caused the accident raising triable issues of fact regarding comparative fault on the part of the Plaintiff. (see Rahman v Montesdeoca, 186 AD3d 631 [2d Dept 2020]).
It is undisputed that Plaintiff testified he was wearing a seatbelt at the time of the accident. Accordingly, the prong of Plaintiff's Motion Sequence No. 001 seeking to strike Defendant Pulla's Second Affirmative Defense alleging comparative fault on the part of the Plaintiff is DENIED with prejudice. The remaining branches of the Plaintiff's Motion Sequence No. 001 seeking to strike Defendant Pulla's Fourth Affirmative Defense alleging Plaintiff's failure to wear a seat belt; and Defendant Uber's Twentieth Affirmative Defense alleging Plaintiff's failure to wear a seat belt are GRANTED with prejudice.

 V. Defendant Uber Motion for Summary Judgment
Defendant Uber seeks summary judgment and dismissal of Plaintiff's complaint and any crossclaims on the ground that Uber did not control Defendant Pulla and cannot be vicariously liable for his conduct. Uber contends that it
is a technology company that uses its proprietary technology to develop and maintain digital multi-sided marketplace platforms. On one side of the marketplace, businesses and individuals utilize Uber's platforms in order to connect with customers and obtain payment processing services. On the other side of the marketplace are other users who can connect and obtain various services from businesses and individuals including drivers, hotels, airlines, restaurants, healthcare providers, and retailers. (NY St Cts Filing [NYSCEF] Doc No. 50).
Uber further maintains that:
[w]hen a user requests a ride using the rider version of the Uber app, the software routes the request to a nearby driver logged into and online in the Driver App and the driver can then choose whether to accept or reject the ride. The driver can cancel trips if they choose even after accepting them.
[Uber] sublicenses the use of the Driver App to independent third-party transportation providers licensed in New York City by the Taxi & Limousine Commission ("TLC"), to provide lead generation services.
In New York City, individuals wishing to use the Driver App to connect with potential [*5]riders as independent drivers sign up for the Uber app and then complete the New York State or local requirements to be active on the platform. It is not an application process. Drivers sign up through the Uber app and provide documentation required by the TLC. They must also supply certain information online including: personal identifying information, photocopies of a valid driver's license, photocopies of a valid TLC license, proof of commercial insurance, and TLC-plated vehicle registration. For New York City TLC drivers, the TLC performs the background check that is required by TLC regulations for sign up.
During the signup process, and after providing these items, he or she must then electronically accept and enter into a Platform Access Agreement ("PAA") with Uber USA, LLC before using the Driver App. Uber Technologies, Inc. has no direct contractual relationship with independent drivers.
UBER did not require drivers to go for an interview as part of the sign up process. UBER did not provide any training for drivers in 2021. To access the Driver App, a driver had to consent to having read the PAA. (see id).
The PAA provides
(a) The relationship between you [Defendant Pulla] and Uber is solely as independent business enterprises, each of whom operates a separate and distinct business enterprise that provides a service outside the usual course of business of the other. This is not an employment agreement and you are not an employee of Uber. You confirm the existence and nature of that contractual relationship each time you access our Platform. We are not hiring or engaging you to provide any service; you are engaging us to provide you access to our Platform. Nothing in this Agreement creates, will create, or is intended to create, any employment, partnership, joint venture, franchise, or sales representative relationship between you and us. The parties do not share in any profits or losses. You have no authority to make or accept any offers or representations on our behalf. You are not our agent and you have no authority to act on behalf of Uber.
(b) We do not, and have no right to, direct or control you. Subject to Platform availability, you decide when, where and whether (a) you want to offer For-hire Service facilitated by our Platform and (b) you want to accept, decline, ignore or cancel a Ride (defined below) request; provided, in each case, that you agree not to discriminate against any potential Rider in violation of the Requirements (defined below). Subject to your compliance with this Agreement, you are not required to accept any minimum number of Rides in order to access our Platform and it is entirely your choice whether to provide For-hire Service to Riders directly, using our Platform, or using any other method to connect with Riders, including, but not limited to other platforms and applications in addition to, or instead of, ours. You understand, however, that your Riders' experiences with your Rides, as determined by Rider input, may affect your ability to access our Platform or provide Rides. (NY St Cts Filing [NYSCEF] Doc No. 37).
"A motion for summary judgment shall be supported by affidavit, by a copy of the pleadings and by other available proof, such as depositions and written admissions" (see Poon v Nisanov, 162 AD3d 804 [2d Dept 2018] quoting CPLR § 3212 [b]). "The moving party's submissions must show 'that there is no defense to the cause of action or that the cause of action or defense has no merit'" (see id). "To defeat summary judgment, the nonmoving party need only rebut the prima facie showing made by the moving party so as to demonstrate the existence of a [*6]triable issue of fact" (see id citing Alvarez v. Prospect Hosp., 68 NY2d 320 [1986]; Stukas v. Streiter, 83 AD3d 18 [2d Dept 2011]).
"On a motion for summary judgment, facts must be viewed 'in the light most favorable to the non-moving party'" (see Shabat v State of New York, 177 AD3d 1009 [2d Dept, 2019] quoting Vega v Restani Constr. Corp., 18 NY3d 499 [2012]; Ortiz v. Varsity Holdings, LLC, 18 NY3d 335 [2011]).
"As a general rule, 'a party who retains an independent contractor, as distinguished from a mere employee or servant, is not liable for the independent contractor's negligent acts'" (see Wendy-Geslin v Oil Doctors, 2024 NY App Div LEXIS 1818 [2d Dept 2024] quoting Kleeman v Rheingold, 81 NY2d 270 [1993]).
"Control of the method and means by which the work is to be done is the critical factor in determining whether one is an independent contractor or an employee for purposes of tort liability" (see Allstate Veh. & Prop. Ins. Co. v Glitz Constr. Corp., 214 AD3d 691 [2d Dept 2023] quoting Sanabria v Borges, 117 AD3d 1024 [2d Dept 2014]; citing Meehan v County of Suffolk, 144 AD3d 640 [2d Dept 2016]). ""Whether an actor is an independent contractor or an employee for the purposes of tort liability is usually a factual issue for the jury. However, where there is no conflict in the evidence, the question may properly be determined as a matter of law" (see id quoting Lombardi v Alpine Overhead Doors, Inc., 92 AD3d 921 [2d Dept 2012]).
"Minimal or incidental control over a person's work product without direct supervision or input over the means used to complete the work is insufficient to establish a traditional employment relationship" (see Meehan v County of Suffolk, 144 AD3d 640 [2d Dept 2016] quoting Parisi v Loewen Dev. Corp., 5 AD3d 646 [2d Dept 2004]; citing Rivera v Fenix Car Serv. Corp., 81 AD3d 622 [2d Dept 2011]).
"The determination of whether an employer-employee relationship exists turns on whether the alleged employer exercises control over the results produced, or the means used to achieve the results. Control over the means is the most important consideration" (see Colon v Compass Group USA, Inc., 188 AD3d 800 [2d Dept 2020] quoting Athenas v Simon Prop. Group, LP, 185 AD3d 884 [2d Dept 2020] quoting Abouzeid v Grgas, 295 AD2d 376 [2d Dept 2002]).
"Factors relevant to assessing control include whether the worker (1) worked at his [or her] own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule" (see id quoting Bynog v Cipriani Group, Inc., 1 NY3d 193; citing Davis v EAB-TAB Enters., 166 AD3d 1449 [3d Dept 2018]; Gagen v Kipany Prods., Ltd., 27 AD3d 1042 [3d Dept 2006]). "[I]ncidental control over the results produced without further indicia of control over the means employed to achieve the results will not constitute substantial evidence of an employer-employee relationship" (see id quoting Weinfeld v HR Photography, Inc., 149 AD3d 1014 [2d Dept 2017] quoting Raja v Big Geyser, Inc., 144 AD3d 1123 [2d Dept 2016]).
Erin O'Keefe testified on behalf of Uber and explained how the process works once a driver has been approved.
The service that Uber provides drivers is what we call lead generation, which is the connection to riders who are looking for a ride as well as things like facilitating payment processing.
And so the process for that would be, after you completed all of those steps we just went through, you would choose to go online. And so, you would open the app. You would hit [*7]a button marked "go" indicating your choice to go online.
At that point depending on what is happening in the marketplace, you may receive something called a ride request from a rider and a driver would then choose to accept, reject or ignore it.
[A]fter the completion of a ride, a driver would be paid by a rider on a per trip basis and it would be generally based on time and distance. In New York City at the time of this incident, there is required minimums that are regulated by the TLC.
[P]art of the services that Uber provides drivers is facilitating payment processing for rider payments to drivers.
[D]rivers get paid on a per trip basis. Their ability to access those rider payments would be dependent on their preferences. There are a few options.
They can choose to have those once a week or up to fivr times a day depending on their preferences. (NY St Cts Filing [NYSCEF] Doc No. 36, pages 15-17).
"Where the proof on the issue of control presents no conflict in evidence or is undisputed, the matter may properly be determined as a matter of law" (see Barak v Chen, 87 AD3d 955 [2d Dept 2011] quoting Bhanti v Brookhaven Mem'l Hosp. Med. Ctr., 260 AD2d 334 [2d Dept 1999]).
Here Uber has demonstrated that it exercised only incidental control over Defendant Pulla and that he was an independent contractor and not an employee. The evidence demonstrates that the service Uber provides drivers is lead generation, which merely connects drivers with riders who are looking for a ride and facilitates the payment processing. Uber does not own the vehicles and drivers are responsible for their own schedules, choosing when to accept ride leads. (see Castro-Quesada v Tuapanta, 148 AD3d 978 [2d Dept 2017]).
"[A]n employee is someone who works for another subject to substantial control, not only over the results produced but also over the means used to produce the results. A person who works for another subject to less extensive control is an independent contractor" (see Matter of O'Brien v Spitzer, 7 NY3d 239 [2006] citing Hertz Corp. v Comm'r of Labor, 2 NY3d 733 [2004]; In re Charles A. Field Delivery Serv., 66 NY2d 516 [1985]).
The evidence clearly establishes Defendant Pulla (1) was able to set his own schedule, take breaks whenever he wanted and had no minimum or maximum hour requirements mandated by Uber (NY St Cts Filing [NYSCEF] Doc No. 24, pages 37-39); (2) had the discretion to accept, reject or ignore ride requests, had the exclusive control over the means and methods of transporting his customers in his own vehicle (see id at pages 41-42); (3) could work and did for other employers, including competitors (see id at pages 45-46); (4) did not receive a salary from Uber, did not receive fringe benefits from Uber and was issued 1099s rather than W2s (see id at page 46; NY St Cts Filing [NYSCEF] Doc No. 38). Further Pulla was not required to wear any type of uniform, paid for his own vehicle's fuel, and was neither taught nor trained by Uber how to drive. (NY St Cts Filing [NYSCEF] Doc No. 24).
In opposition, Plaintiff has failed to raise a triable issue of fact. Plaintiff submits UBER is vicariously liable for the accident because Defendant Pulla testified that he looked at the UBER App's GPS with one eye and drove straight with his other eye. While the question of whether or not Defendant Pulla was distracted using an app on his cellular phone is an issue of fact to be considered at trial, Defendant Uber is not vicariously liable. Defendant Pulla could just as easily have been using any number of navigation apps at the time of the accident.
Accordingly, Motion Sequence No. 002 filed by Defendant Uber seeking summary [*8]judgment and dismissal of Plaintiff's complaint and any crossclaims is GRANTED with prejudice.

VI. Summary Judgment on Damages
Defendants have the prima facie burden of demonstrating that Plaintiff did not sustain a serious injury within the meaning of Insurance Law § 5102 [d] as a result of the accident (see Menjivar v. Capers, 214 AD3d 640 [2d Dept 2023] citing Toure v. Avis Rent a Car Sys., 98 NY2d 345 [2002]; Gaddy v. Eyler, 79 NY2d 955 [1992]).
"Serious injury" means a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment. (see CLS Ins § 5102 [d])
Defendants must submit competent medical evidence establishing, prima facie, that Plaintiff did not sustain serious injuries under the permanent consequential limitation of use or significant limitation of use categories of Insurance Law § 5102 [d] (see id citing Zennia v. Ramsey, 208 AD3d 735 [2d Dept 2022]; Reddick v. Hickey, 197 AD3d 581 [2d Dept 2021]; Singleton v F & R Royal, Inc., 166 AD3d 837 [2d Dept 2018]; Nuñez v Teel, 162 AD3d 1058 [2d Dept 2018]).
Applying what could be gleaned from the legislative intent, the Court of Appeals, analyzing the word "significant," wrote that "the word 'significant' as used in the statute pertaining to 'limitation of use of a body function or system' should be construed to mean something more than a minor limitation of use. We believe that a minor, mild or slight limitation of use should be classified as insignificant within the meaning of the statute" (see Grossman v. Wright, 268 AD2d 79 [2d Dept 2000] quoting Licari v. Elliott, 57 NY2d 230 [1982]).
"[T]he legislative intent of the 'no-fault' legislation was to weed out frivolous claims and limit recovery to major or significant injuries. In that regard, summary judgment should be granted in cases where the plaintiff's opposition is limited to 'conclusory assertions tailored to meet statutory requirements'" (see id quoting Lopez v. Senatore, 65 NY2d 1017 [1985]; citing Carroll v. Jennings, 264 AD2d 494 [2d Dept 1999]).
Plaintiff contends that as a direct result of the accident, he was confined to Staten Island University Hospital, on January 15, 2023. (NY St Cts Filing [NYSCEF] Doc No. 61). Plaintiff further contends that on April 26th, 2023, Plaintiff under anesthesia had left shoulder arthroscopy with debridement, synovectomy, chondroplasty, bursectomy, acromioplasty, excision, and repair and was confined to SUNY Downstate Medical Center in Brooklyn, New York. (see id).
Plaintiff has submitted Medical Affirmation of Daniel W. Wilen, M.D., who treated the Plaintiff after the accident, has reviewed Plaintiff's diagnostic films, has examined Plaintiff most recently, on January 15, 2024, and continues to treat Plaintiff to date. (NY St Cts Filing [NYSCEF] Doc No. 77).
Dr. Wilen maintains in his affirmation,
[t]hat based upon my examination, review of medical records and diagnostic tests, and [*9]treatment, as well as his condition at the time of my examination, it is my opinion with a reasonable degree of medical certainty that Plaintiff . . . will continue to suffer pain and discomfort with significant permanent functional residual disability with respect to his left shoulder, cervical spine, thoracic spine, and lumbar spine. I base this opinion on the history given by Plaintiff, my physical examinations of him, the surgery performed upon Plaintiff, my review of his medical records, as well as my review of the results of his numerous diagnostic tests. It is my opinion with reasonable medical certainty that the restriction of ranges of motion in Plaintiffs left shoulder, cervical spine, thoracic spine, and lumbar spine noted above are permanent, as he has had extensive treatment, including surgery of the left shoulder, surgery of the cervical spine, multiple injections, and physical therapy and still remains symptomatic over one year and four (4) months following the accident.
It is anticipated that the Plaintiff . . . will require future treatment to manage the aforementioned symptoms caused by his injuries. This treatment will include epidural injections in the cervical, thoracic, and lumbar spine throughout his lifetime. The Plaintiff may also require cervical and lumbar fusions to the cervical, thoracic, and lumbar spine due to the significant herniated discs in all three areas.
Plaintiff . . . will also require physical therapy of the left shoulder throughout his lifetime and a possible total shoulder replacement. (NY St Cts Filing [NYSCEF] Doc No. 79).
Plaintiff testified, regarding the impairment of his activities of daily living:
Q. When you returned three weeks after the accident, did you work the same hours?
A. Yes, well, I kind of left early a lot of days. I was on light duty the whole time. So from when the accident happen, I got put on light duty right away, so I couldn't do anything anyway so I kind of left every day early and stuff. I didn't stay a full day because I couldn't. My back and my neck, everything was tensing up on me right after the accident, so I was never comfortable at work so I left a lot of days early and stuff like that.
Q.When you say light duty, did anybody place you on light duty or is that—
A. Yes.
Q. Who?
A. The doctor, Dr. Germino placed me on light duty and Dr. Wilen when I had the surgery and Dr. Vora also when I had the surgery with the neck. I've always been on light duty since the accident happen.
Q. Up until today?
A. I'm still on light duty now.
Q. What's the difference between the light duty you do now and the regular duty that you did before the accident?
A. I mean now I'm sitting at a desk when I was the chief engineer, I'm running the building so I have to kind of help out and handle things in the building when things go wrong, pipes break, things happen in buildings, you know. You can't prevent things from happening. And now it's more of me just standing there and just supervising. I can't even lift a wrench. I can't do any work. So it's me standing there or me sitting at a desk. And I can't sit at a desk for long periods of time because my back and my neck stiff up and I get pain so. It's kind of me pretty much being there just to supervise at this point. It's been like that since the accident.
Q. You had the surgery to your left shoulder in April of this year?
A. It was April, May, around that time.
Q. Did you miss any time from work after the shoulder surgery?
A. Yes.
Q. How much?
A. About another three weeks, two to three weeks. (NY St Cts Filing [NYSCEF] Doc No. 22 pages 51-53).
Q. Did you miss any time from work after returning after the shoulder surgery up until the neck surgery, did you miss any time in that—
A. Yeah, I mean there's days that I took off a couple of days because I was in pain in my neck or pain in my back, where I just couldn't go in, you know. So there's days here and there but not like weeks at a time[.]
Q. About how many days did you miss?
A. I would say maybe 15, 20, 25. I don' t know the exact number.
Q. Did you miss any time from work after the neck surgery a few weeks ago?
A. Yes, I just went back this week. (see id at pages 54-55).
Q. Are there any activities you're claiming have been affected by the accident?
A. My whole daily life activities. I have a whole list, if you have time to go over everything. I have a whole list of everything if you have time to go over everything.
A. Okay. So, I'm 31 years old. I have two kids. I'm obviously trying to have another kid, you know. I have two daughters, I obviously want a son. You know, I'm a man, I want a son. I haven't even had intimacy with my wife since the accident happen, that's number one. Number two, I can't even play with my kids. I can't lift them up. I can't take them out of the car. At parties, I can't even do nothing. I have to just stand there like I'm a cripple. I can't take out the garbage in my own house. If affects my daily work activity in every aspect, because I run the building and there's things that sometimes if you don't do them yourself, it doesn't get done right way and now I don't have that luxury anymore. Now I only have the luxury of pointing the finger and saying get this done, get that done, and that's not the way—that's not the job title I have. The job title I have is I'm the chief engineer, I have to run the whole building, and now I can't do any of that. I can't even do the laundry in my house. I can't take laundry out of the washing machine or the dryer. My whole life since this accident affected me tremendously. And who's to say in 20 years from now, it's not going to be worse. I'm 31 now. At 51, what am I going to have to have surgery on my shoulder again. You're not getting it back, that never goes away. Your neck and back, I'll always have—forever I'11 always have pain and always be never 100 percent again. (see id at pages 57-59).
Plaintiff appeared for an orthopedic Independent Medical Examination with Dr. Pierce J. Ferriter on January 23, 2024. Plaintiff reported to Dr. Ferriter that he was involved in a motor vehicle accident on January 13, 2023 and he was rendered unconscious as for few seconds a result of the accident. (NY St Cts Filing [NYSCEF] Doc No. 63). Dr. Ferriter found that Plaintiff's ranges of motion of his cervical spine, thoracic spine, lumbar spine, left shoulder, left elbow, and right knee were all normal. (see id). Dr. Ferriter's examination further revealed no evidence of orthopedic disability or permanency. (NY St Cts Filing [NYSCEF] Doc No. 64).
Defendants must submit competent medical evidence establishing, prima facie, that Plaintiff did not sustain serious injuries under the permanent consequential limitation of use or significant limitation of use categories of Insurance Law § 5102 [d] (see id citing Zennia v. [*10]Ramsey, 208 AD3d 735 [2d Dept 2022]; Reddick v. Hickey, 197 AD3d 581 [2d Dept 2021]; Singleton v F & R Royal, Inc., 166 AD3d 837 [2d Dept 2018]; Nuñez v Teel, 162 AD3d 1058 [2d Dept 2018]).
Dr. Ferriter's medical opinions are in direct opposition to Dr. Wilen's opinions, and as such, create an issue of material fact. Defendant Pulla did not meet his prima facie burden of showing that because of the accident, the Plaintiff did not sustain a serious injury within the meaning of Insurance Law § 5102 [d].
Accordingly, Motion Sequence #003 seeking summary judgment on the issue of damages and any possible claim of economic loss, on the grounds that plaintiff did not sustain a "serious injury" because of the accident as defined by Insurance Law § 5102 [d], and as required by Insurance Law § 5104 [a] is DENIED, with prejudice.

 VI. Decretal Paragraphs
It is hereby ORDERED that the prong of Plaintiff's Motion Sequence No. 001 seeking summary judgment on the issue of Defendant Pulla's negligence in favor of the Plaintiff and against Defendant Pulla pursuant to CPLR § 3212 on the grounds that no material issues of fact exist regarding any negligence and/or liability on his part is DENIED, with prejudice; and it is further,
ORDERED, that the prong of Plaintiff's Motion Sequence No. 001 seeking to strike Defendant Pulla's Second Affirmative Defense alleging comparative fault on the part of the Plaintiff is DENIED with prejudice; and it is further,
ORDERED, that the prong of Plaintiff's Motion Sequence No. 001 seeking to strike Defendant Pulla's Fourth Affirmative Defense alleging Plaintiff's failure to wear a seat belt is GRANTED with prejudice; and it is further,
ORDERED, that the prong of Plaintiff's Motion Sequence No. 001 seeking to strike Defendant Uber's Twentieth Affirmative Defense alleging Plaintiff's failure to wear a seat belt is GRANTED with prejudice; and it is further,
ORDERED, that Defendant Uber's Motion Sequence No. 002 seeking summary judgment and dismissal of Plaintiff's complaint and any crossclaims is GRANTED with prejudice; and it is further,
ORDERED, that the Defendant Pulla's Motion Sequence #003 seeking summary judgment on the issue of damages and any possible claim of economic loss, on the grounds that plaintiff did not sustain a "serious injury" because of the accident as defined by Insurance Law § 5102 [d], and as required by Insurance Law § 5104 [a] is DENIED, with prejudice; and it is further,
ORDERED, that the Clerk of the Court shall enter judgment accordingly.
The foregoing shall constitute the Decision and Order of this Court.
Dated: May 31, 2024
Staten Island, New York
E N T E R,
HON. RONALD CASTORINA, JR.
JUSTICE OF THE SUPREME COURT